IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

REZA MOTAMENI, an individual;
MOTO-BIZ, INC., an Oregon
corporation,

            Plaintiffs,

    v.

MELISSA ADAMS, an individual
formerly known as Melissa Motameni,

            Defendant.

MELISSA ADAMS, individually and
derivatively on behalf of MOTO-BIZ,
INC., an Oregon corporation; MOJO-BIZ,
LLC, an Oregon limited liability company;
NOOR, LLC, an Oregon limited liability
company; LUCKY STRIKE NW, LLC, an
Oregon limited liability company,

            Counterclaimants and
            Third-Party Plaintiffs,

    v.

No. 3:21-cv-01184-HZ

OPINION & ORDER

RAY MOTAMENI, an individual;
KIMBERLY JOHNSON, an individual;
R AND K VANCOUVER INVESTMENTS,
LLC, an Oregon limited liability company,

> Counterclaim Defendant
> and Third-Party Defendants.

Nicholas J. Henderson
Motschenbacher & Blattner LLP
117 SW Taylor St., Suite 300
Portland, OR 97204

> Attorney for Plaintiff

Janet K. Larsen
Brian T. Kiolbasa
Mohammed Workicho
Lane Powell PC
601 S.W. Second Ave., Suite 2100
Portland, OR 97204

> Attorneys for Defendant and
> Third-Party Plaintiffs

Shannon L. Armstrong
Kristin M. Asai
Kelsie G. Crippen
Holland & Knight, LLP
601 SW Second Avenue, Suite 1800
Portland, OR 97204

> Attorneys for Third-Party
> Defendants.

HERNÁNDEZ, District Judge:

Plaintiff Reza ("Ray") Motameni, as director, officer, and 50% shareholder of Moto-Biz,

Inc. ("Moto-Biz"), brings this action against Defendant Melissa Adams, who is also a director,

officer, and 50% shareholder. Plaintiff brings claims derivatively on behalf of Moto-Biz, alleging

that Defendant breached her fiduciary duties to the corporation and seeking remedies under Or.

Rev. Stat. § (O.R.S.) 60.952 for deadlock among the directors of a close corporation.

On January 10, 2022, the Court entered an Opinion & Order denying Defendant's motion

to dismiss Plaintiff's Second Amended Complaint. ECF 24. Defendant then filed an Amended

Answer in which she brought counterclaims and third-party claims against Kimberly Johnson

and R and K Vancouver Investments, LLC ("R&K") (collectively, "Third-Party Defendants").

Defendant asserts claims, individually and derivatively on behalf of Moto-Biz, Mojo Biz, LLC

("Mojo Biz"), Noor, LLC ("Noor"), and Lucky Strike NW, LLC ("Lucky Strike"). On August

25, 2022, the Court granted in part and denied in part Plaintiff and Third-Party Defendants'

Motions to Dismiss. ECF 58.

Now before the Court are Plaintiff's, Defendant's, and Third-Party Defendants' cross-

motions for summary judgment. Plaintiff moves for summary judgment on Defendant's

counterclaims. Defendant moves for summary judgment on all of Plaintiff's claims and all of

Defendant's counterclaims. Defendant does not move for summary judgment on her third-party

claims. Third-Party Defendants move for summary judgment on all of Defendant's third-party

claims. The Court held oral argument on the summary judgment motions on May 15 and May

16, 2023.

## BACKGROUND

### I.      Moto-Biz

Plaintiff Motameni and Defendant Adams, who were formerly married, each have owned

50% of the outstanding shares of Moto-Biz since it was incorporated in Oregon in 1991. Banks

Decl. Ex. 1 ("Adams Dep.") 24:1-5; 174:10-11, ECF 85-1. Moto-Biz operates several salon

businesses in Portland, Oregon under the name "Dosha." *Id.* at 23:22-25; 25:2-5. When Moto-

Biz was incorporated, Motameni and Adams appointed themselves as sole members of the two-person Board of Directors. Larsen Decl. Ex. 1 ("Motameni Dep.") 53:24-54:8, ECF 87. The Moto-Biz Bylaws provide that the business affairs of the corporation shall be managed by its Board of Directors, who shall hold regular meetings in which "a majority of the total number of directors shall constitute a quorum for the transaction of business." Larsen Decl. Ex. 2 at 19-20, ECF 87. Defendant Adams signed the Bylaws as "President" and Plaintiff Motameni was appointed "Secretary." *Id.* at 26. The Bylaws also state: "The President . . . shall have the general and active management of the business of the corporation, and shall see that all orders and resolutions of the Board are carried into effect." *Id.* at 22.

Despite their named officer positions, Adams continued to work as a hairdresser by trade, while Motameni mostly managed the business affairs of the corporation. Motameni Dep. 44:23-45:10. The parties agreed that they would receive equal compensation from Moto-Biz as shareholder draws. Larsen Decl. Ex. 4 ("Gardner Dep. 87:22-24"), ECF 87. By 2007 or 2008, Adams was receiving $7,500 per month from Moto-Biz. Motameni Dep. 60:5-62:13. In lieu of paying Motameni a set monthly draw, Moto-Biz directly paid certain amounts on Motameni's personal credit card bills. Gardner Dep. 99:20-22. Moto-Biz also paid portions of Motameni's credit card bills as reimbursement for company expenses he incurred. *Id.* 99:23-100:21. Thus, payment to Motameni for his personal shareholder draws and for business expenses were often intermingled. At the end of each year, the Moto-Biz bookkeeper would reconcile Plaintiff's and Defendant's accounts with the intention that each would receive an equal amount of compensation from Moto-Biz. *Id.* 87:14-25.

In 2003 or 2004, Moto-Biz hired Third-Party Defendant Kimberly Johnson to work in internal management and marketing. Larsen Decl. Ex. 3 ("Johnson Dep.") 36:6-7, ECF 87.

Around 2006 or 2007, Motameni and Johnson began having an affair that led to Motameni's divorce from Adams in 2010. Johnson Dep. 100:21-24; Adams Decl. ¶ 8, ECF 88. After the divorce, Motameni and Adams remained in business together. Adams Decl. ¶ 8; Motameni Dep. 55:2-12. Motameni and Adams each retained 50% stock ownership of Moto-Biz and remained its only two directors. Motameni Dep. 54:9-18. In 2012, Adams moved to California, and the parties orally agreed that Motameni would assume full responsibility of the day-to-day management of Moto-Biz and its salons. Adams Dep. 61:6-62:1. Both parties continued to receive equal distributions from the corporation, and the parties agreed that Motameni would receive no additional compensation for managing the business operations. Motameni Dep. 55:2-12. No written document codifies the financial arrangement after the parties divorced and Adams moved to California. The parties do not claim that any formal action was taken by the Moto-Biz Board of Directors, which still consisted of only Motameni and Adams, that modified their named positions as President and Secretary. Adams Dep. 92:11-21; Larsen Decl. Ex. 2.

In July 2019, Motameni asked Adams to stop taking $7,500 monthly draws from Moto-Biz because the company was not doing well financially. Motameni Dep. 84:21-25; 93:6-8. Adams agreed that the company was "in dire financial straits" and thought it was appropriate to discontinue the draws. Adams Dep. 74:15-75:3. Motameni asserts that he also stopped taking personal compensation from Moto-Biz, but he continued to pay portions of his credit card bills from company funds as expense reimbursements. At the same time, Moto-Biz kept paying Johnson a full-time salary of $2,581.76 until March 2020 and then began paying her $2,876.07 bi-weekly when she was "rehired" in mid-2022. Motameni Dep. 237:5-238:8.

In March 2020, Moto-Biz temporarily closed its salons because of the COVID-19 pandemic. Adams Dep. 137:22-25. Motameni applied for a federal Paycheck Protection Program

("PPP") loan with Adams's approval. *Id.* at 138:1-6. On the PPP loan application, Motameni listed Adams as "President" of Moto-Biz. Larsen Decl. Ex. 1 at 74. Later, when Motameni sought to apply for a second PPP loan, Adams refused to provide her driver's license as identification, which was necessary to complete the loan application. Motameni Dep. 95:18-96:8. Adams was concerned Motameni had used funds from the first PPP loan to pay $100,000 on his personal credit card and to reimburse $150,000 to a contractor without her authorization. Adams Dep. 139:5-12. Before she would provide information for the loan application, Adams "asked for an agreement on how the funds would be spent." *Id.* at 138:20-139:1. She also requested that any PPP loan funds be placed in a jointly held account that would require both her and Motameni's signatures to withdraw funds. *Id.* at 139:1-5. Motameni refused those conditions. *Id.* at 141:2-17. The second PPP loan application was never submitted.

## II.    **Mojo-Biz**

Mojo Biz was formed as an Oregon limited liability company in 2005. Banks Decl. Ex. 4 ("Mojo Biz Operating Agr."), ECF 85-4. Mojo Biz has four members each of whom owns a share proportionate to their initial capital contributions: Plaintiff Motameni owns 28%; Defendant Adams owns 24%; Third-Party Defendant Johnson owns 24%; and Johnson's ex-husband, Andy Johnson, owns 24%. *Id.* §§ 2.1, 2.2. Mojo Biz was formed to operate a beauty school—the Aveda Institute of Portland. Banks Decl. Ex. 5 ("Johnson Dep.") 88:6-14, ECF 85-5. Plaintiff Motameni is the "Operating Manager" of Mojo Biz. Mojo Biz Operating Agr. § 4.1.1. As Operating Manager, Motameni "must take all actions that may be necessary or appropriate . . . for the Company to conduct the business in which it is engaged[.]" *Id.* § 4.4. Motameni has the authority as Operating Manager to expend funds in furtherance of the Company's business, execute all documents, and borrow and raise money. *Id.* § 4.1.1. The Operating Manager "may

initiate a required capital contribution" from all members by giving the members written notice. *Id.* § 2.3.1. The Mojo Biz Operating Manager "has no liability to the Company or to any other Member for any loss suffered by the Company or any Member that arises out of any action or inaction of the Operating Manager if the Operating Manager, in good faith, determined that such conduct was in the best interest of the Company and such course of conduct did not constitute gross negligence or intentional wrongful misconduct." *Id.* § 4.5.

Under the Mojo Biz Operating Agreement, neither the Operating Manager nor any member is "entitled to compensation in the form of salary for their efforts on behalf of the Company." *Id.* § 5.3. Any distributions must be made to the members "in equal amounts regardless of their respective Ownership Interests at times and in amounts as the Operating Manager may deem appropriate." *Id.* § 3.3.

Even though no member could receive a "salary," sometime in 2009 or 2010, all four members of Mojo Biz discussed and agreed that Motameni and Johnson would receive compensation in the form of "guaranteed payments" for the work they each performed in running the Aveda Institute. Motameni Dep. 225:2-226:2; Johnson Dep. 108:2-8; 109:5-11. No written document codified this discussion or agreement at that time. Motameni Dep. 226:3-5. Between 2010 and 2017, Mojo Biz reported making annual guaranteed payments that varied between $175,000 and $275,000. Banks Decl. Ex. 13. On its 2011 tax return, Mojo Biz reported total guaranteed payments of $197,500. Banks Decl. Ex. 14, ECF 85-14. And on its 2021 Income Statement, the Aveda Institute reported spending $180,000 on guaranteed payments. Larsen Decl. Ex. 4 at 33.

On June 22, 2020, Plaintiff emailed the other Mojo Biz members, proposing amendments to the Operating Agreement. Banks Decl. Ex. 23, ECF 85-23. In the email, he stated:

> Due to concerns brought up a year ago, I have been documenting all decisions in writing. While the guaranteed payments have been made with full knowledge and disclosure since the beginning, I am now documenting approval in writing of these proposals.

*Id.* Andy Johnson, the fourth member of Mojo Biz, responded by approving the proposed amendments. On June 24, 2020, a "Proposed Resolution" document was executed by Motameni, Johnson, and Andy Johnson, which stated:

> RESOLVED that all previous Guaranteed Payments are approved, adopted, ratified, and confirmed in all respects.

> RESOLVED FURTHER that so long as Ray and Kim continue to provide such services, the continued payment of the Guaranteed Payments is approved and authorized.

Banks Decl. Ex. 10, ECF 85-10. Adams did not express agreement to the proposed resolution. *Id.*

On July 15, 2019, Motameni sent a formal written request for capital contributions from members of Mojo Biz, seeking contributions of $84,000 from the other three members and $96,000 from himself for a total of $350,000. Motameni Dep. 142:2-7, 145:16-21; Larsen Decl. Ex. 1 at 87. In an email to the other three Mojo Biz members on July 24, 2019, Motameni summarized the reasons for the cash call and the planned use of the funds. Larsen Decl. Ex. 1 at 87-88. The email provided an update on Mojo Biz, noting in part that "[a]dmission sales have stayed stagnant in the past 2.5 years." *Id.* at 88. Motameni outlined some future plans for the business, which included developing and subleasing Aveda Institute space. *Id.* The infusion of cash was to be used to "offset lease expenses," "infuse cash in areas needed for operational expenses," and "infuse cash to support business during admission number decline, as well as, decline in retail/service revenue," "[r]emarketing & development of 3rd floor uses to enhance lease or sub-lease opportunities," and "[i]ncrease employee time and cost of increased compliance regulations." *Id.* at 87-88.

In the July 24, 2019 email, Motameni reported that the "[c]ash call was approved by majority vote," with himself, Johnson, and Andy Johnson voting "yes" and Adams voting "no." *Id.* at 87. Motameni later reduced the capital call amount to $200,000 total. Motameni Dep. 156:1-5.

## III.    R&K

### A.    Purchase of the Vancouver Building

In 2013, Plaintiff Motameni and Third-Party Defendant Johnson formed R&K, with Motameni as 51% owner and Johnson as 49% owner. Banks Decl. Ex. 26 § 2.2, ECF 85-26. R&K was created for the purpose of owning, operating, and leasing a building in Vancouver, Washington ("Vancouver Building"). *Id.* § 1.3. Plaintiff and Third-Party Defendant sought to use the Vancouver Building to house another campus for the Aveda Institute. All members of Mojo Biz, including Defendant Adams, contributed to the $347,621 down payment to purchase the Vancouver Building through draws from their Mojo Biz capital accounts. Banks Decl. Ex. 29, ECF 85-29. Adams and Andy Johnson each contributed $100,000, while Motameni and Johnson each contributed $73,811. *Id.* For tax purposes, Adams's $100,000 contribution was categorized as a gift, and Adams knew that a gift tax return was filed on her behalf in 2014. Banks Decl. Ex. 30, ECF 85-30. Adams was also aware, at least as early as 2014, that she received no ownership interest in the Vancouver Building or in R&K from her $100,000 contribution. *Id.;* Adams Dep. 192:15-25.

### B.    Mortgage Loan and Promissory Note

To purchase the Vancouver Building, R&K obtained a $3,072,500 mortgage loan from Wells Fargo Bank on June 28, 2013, for which Adams executed unconditional guarantees on behalf of herself, Moto-Biz, Mojo Biz, and Noor. Banks Decl. Ex. 33, ECF 85-33; Ex. 34, ECF

85-34. Of the loan amount, $1,207,817 was designated as a "construction holdback" to cover the costs of the buildout of the Aveda Institute campus. Banks Decl. Ex. 28. To assign most of the cost of the buildout to Mojo Biz, Motameni executed a "Promissory Note" from Mojo Biz to R&K in the amount of $907,790. Motameni Dep. 252:11-253:5; Banks Decl. Ex. 37, ECF 85-37. The Promissory Note encumbered Mojo Biz with monthly payments to R&K of $5,601.76 over thirty months. Banks Decl. Ex. 37. The Vancouver campus opened in January 2014, resulting in profits to Mojo Biz that were divided among the members' capital accounts. Banks Decl. Ex. 39, ECF 85-39.

In June 2019, Motameni and his accountant sought to reduce the Promissory Note balance by $500,000 because they needed to lower the liabilities listed on Mojo Biz's books for accreditation purposes. Banks Decl. Ex. 40, ECF 85-40. Motameni first proposed that each of the four members take $125,000 as an individual liability. *Id.* But no member assumed the individual liability. Instead, R&K simply reduced the amount owed by Mojo Biz by $500,000. Banks Decl. Ex. 41, ECF 85-41. When the R&K promissory note was reduced, $125,000 was credited to Adams's Mojo Biz capital account, and the same amount was listed as "receivable" from Adams on R&K's books. Gardner Dep. 203:21-204:18.

### C. Mojo Biz Lease of the Vancouver Building

In 2013, Mojo Biz leased the Vancouver Building from R&K to use the building as its Vancouver Campus of the Aveda Institute. Banks Decl. Ex. 35, ECF 85-35. Motameni signed the lease agreement on behalf of Mojo Biz, and Johnson signed the agreement on behalf of R&K. Motameni Dep. 189:10-190:14. All Mojo Biz members, including Adams, executed an agreement assigning and subordinating the lease on June 28, 2013. Banks Decl. Ex. 35. The parties do not specify the amount Mojo Biz pays each month to lease the Vancouver Building

from R&K. Defendant claims Mojo Biz pays R&K more in rent each month than the cost of R&K's monthly mortgage payment. Plaintiff and Third-Party Defendant assert that Mojo Biz pays less to rent R&K than it does to rent other buildings for the Aveda Institute.

## IV.    Noor

Motameni and Adams are each 50% owners of Noor, LLC, which owns a building in Portland, Oregon ("Noor Building"). Adams Dep. 118:22-25; Adams Decl. ¶ 20, ECF 88. Mojo Biz uses the Noor Building for office space and keeps school supplies for the Aveda Institute there. Adams Decl. ¶ 21. Mojo Biz does not have a lease and does not pay rent to Noor for its use of the Noor building. *Id.*

R&K's operating agreement identifies the Noor Building as its principal business office in Oregon. Larsen Decl. Ex. 1 at 90. R&K does not pay rent for its use of the Noor Building. Adams Decl. ¶ 21. R&K uses the Noor Building as is mailing address and receives mail there. Motameni Dep. 186:9-19. No evidence presented by either party shows whether R&K uses the Noor Building for any other purpose.

When R&K obtained a mortgage loan on the Vancouver Building in 2013, Adams executed an "unconditional guarantee" of the loan on behalf of Noor. Banks Decl. Ex. 34.

## V.    Lucky Strike

In October 2016, a natural gas leak caused an explosion that demolished one of Moto-Biz's salons in Northwest Portland. Moto-Biz collected over one million dollars in insurance proceeds. Motameni Dep. 131:15-22. Motameni and Adams formed Lucky Strike, LLC to purchase a building ("Lucky Strike Building") to replace the destroyed salon. *Id.* at 132:8-14. Some of the insurance funds were used to pay the down payment on the Lucky Strike Building and some mortgage payments. *Id.* The parties planned to use the remaining insurance funds to

build out the Lucky Strike Building to replace the destroyed salon. *Id.* at 132:15-24. The build-out was never done. *Id.* The Lucky Strike Building was eventually sold, and the remaining insurance funds were placed in a Moto-Biz bank account for operational expenses. *Id.* at 132:25-133:6.

In 2020, Motameni hired the law firm Miller Nash to pursue additional insurance coverage related to destruction of the Northwest Portland spa. Adams Decl. ¶ 32, Ex. 5. Adams was unaware of this litigation. Adams Decl. ¶ 32. Miller Nash obtained a favorable settlement for Moto-Biz but held the proceeds in a trust account while a dispute over their legal fees was resolved. Adams Decl. Ex. 5. Adams refused to sign documents authorizing payment of the legal fees that would release the funds in the trust account to Moto-Biz. Adams Decl. ¶ 33, Ex. 5. Adams later negotiated directly with Miller Nash, who agreed to reduce their fees by 50% and waive all accrued interest. *Id.* The insurance settlement funds remain in an escrow account and have not yet been dispersed to Moto-Biz. *Id.*

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108,

1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be

drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of

Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d

1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what

inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Plaintiff Motameni brings derivative claims on behalf of Moto-Biz against Defendant

Adams for breach of the duty of care and breach of the duty of loyalty. Both claims are based on

the same facts. He also brings a claim for "Deadlock and Oppression" in a close corporation

under O.R.S. 60.952. Defendant moves for summary judgment on all of Plaintiff's claims.

Defendant brings counterclaims individually and derivatively on behalf of Moto-Biz, Mojo Biz, Noor, and Lucky Strike against Plaintiff for breach of fiduciary duties, breach of contract, conversion, and unjust enrichment.[1] Defendant also asserts claims against Third-Party Defendant Johnson and Third-Party Defendant R&K for conversion and unjust enrichment and for aiding and abetting Plaintiff in his breach of fiduciary duties. Plaintiff and Third-Party Defendants move for summary judgment on Defendants' counterclaims and third-party claims. Defendant moves for summary judgment on her counterclaims but not on her third-party claims.

## I.    Plaintiff's Claims

### A.    Breach of Fiduciary Duties

Plaintiff bases each of his claims for breach of the duty of care and breach of the duty of loyalty on the same acts or failure to act by Defendant. Plaintiff alleges that Defendant, as a director or officer, breached fiduciary duties owed to Moto-Biz by: (1) refusing to provide photo identification necessary to apply for a second PPP loan and (2) refusing to sign documents that would allow payment of legal fees that would release the insurance settlement funds held in trust for Moto-Biz.

In her summary judgment motion, Defendant asserts that her decision not to apply for the second PPP loan was a valid business decision protected by the business judgment rule. Defendant also argues that Moto-Biz did not suffer damages from that the decision. According to

---

[1] Defendant also asserts a counterclaim seeking an accounting of asserts of Moto-Biz, Mojo Biz, and R&K. In an August 2022 Opinion & Order, the Court dismissed Defendant's claim for an accounting of R&K because Defendant has no ownership interest in R&K. *See Motameni v. Adams*, No. 3:21-cv-01184-HZ, 2022 WL 3682940, at *8 (D. Or. Aug. 25, 2022). But Defendant's claim seeking an accounting of Moto-Biz and Mojo Biz remains. No party addresses this claim in their summary judgment motions.

Defendant, whether the business would have received a loan and whether the loan would have been forgiven is purely speculative.

As for the insurance settlement funds, Defendant asserts that Moto-Biz has not suffered damages from her actions. According to Defendant, because she negotiated a 50% reduction in the legal fees and forgiveness of all accumulated interest, her overall actions resulted in a financial benefit to Moto-Biz rather than a loss. Plaintiff asserts that Moto-Biz has and continues to suffer damages because the funds have not been released and are therefore not available to Moto-Biz.

      i.    *Business Judgment Rule*

All corporate directors and officers owe the fiduciary duties of loyalty, good faith, and fair dealing to the corporation. *Chiles v. Robertson*, 94 Or. App. 604, 619, 767 P.2d 903, 911 (1989). Defendant owes fiduciary duties to Moto-Biz based on her positions as a director and as an officer. Under the business judgment rule, courts presume that directors and officers of a corporation acted "in good faith and in the honest belief that the action taken was in the best interests of the corporation." *Crandon Cap. Partners v. Shelk*, 219 Or. App. 16, 31, 181 P.3d 773 (2008) (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)).  "The rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Thus, courts must not substitute their judgment for that of officers or directors whose decisions "can be attributed to any rational business purpose." *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del. 1985). As the shareholder bringing this derivative suit, Plaintiff has the burden to rebut the business judgment rule's presumption that Defendant acted in good faith and in the best interest of Moto-Biz. *See Cede & Co.*, 634 A.2d at 361.

As for the second PPP loan, Plaintiff does not present facts that rebut the presumption that Defendant had a rational business reason to decide not to support the loan application. Plaintiff makes the conclusory allegation that Defendant simply refused to cooperate in order to thwart the business operations of Moto-Biz. But Defendant explains her reasoning: she refused to approve the loan application without assurance that the loan proceeds would be used in a responsible manner and for the betterment of Moto-Biz. Defendant expressed concern that $150,000 of the first PPP loan was used to pay Plaintiff's personal credit card bills rather than benefit the business. Defendant explains that she sought to ensure that the loan would be used for purposes that would allow it to be forgivable. So that she could know where funds from a second PPP loan would be spent, Defendant asked that Plaintiff (1) provide a budget; (2) have a formal agreement on the uses of the funds; and (3) put the funds in a jointly held account. The Court finds that Defendant, as a corporate officer, made a rational business decision in refusing to support the second PPP loan application without these conditions.

Plaintiff next argues that Defendant breached her fiduciary duties because she failed to make an informed decision about the second PPP loan. *See id.* at 367 (the duty of care includes "the duty of directors of a company to act on an informed basis"). But the facts show that information is precisely what Defendant sought to obtain from Plaintiff. Before she would support the second PPP loan application, Defendant asked to see credit card statements and other financial documents to understand if the first PPP loan funds were spent on the business. To overcome the business judgment rule, Plaintiff has the burden to show that Defendant's decision was in bad faith or was made without a legitimate purpose. Because Plaintiff fails to show that Defendant's request for information and assurances lacked a business purpose, he does not meet that burden.

Similarly, as for the insurance settlement funds held in trust, Defendant sought information before agreeing to authorize payment of legal fees to release the funds. Defendant was initially unaware of the litigation, legal expenses, or additional insurance settlement. After she learned that Plaintiff had hired a law firm to collect additional insurance proceeds, Defendant negotiated a 50% reduction of the legal fees and forgiveness of any accrued interest. Defendant simply sought information before taking action, and Plaintiff presents no evidence that Defendant acted without a legitimate business purpose. Accordingly, because Plaintiff cannot overcome the business judgment rule, Defendant is entitled to summary judgment on Plaintiff's claims for breach of the duty of care and breach of the duty of loyalty.

       *ii.*     *Damages*

Plaintiff's breach of fiduciary duties claims also fail because he does not show that Defendant's actions damaged the corporation. Plaintiff argues that because Moto-Biz had previously obtained a PPP loan, approval of a second forgivable PPP loan in the amount of $800,000 would have been "virtually automatic." Pl. Resp. Def. Mot. Summ. J. 24, ECF 98. Thus, Plaintiff alleges $800,000 in damages.

Even if Defendant's decision to oppose a second PPP loan were not protected by the business judgment rule, Plaintiff only has a claim if "damages are not too uncertain to occur or too speculative to be proven." *Allen v. United Food & Com. Workers Int'l Union*, 43 F..3d 424, 427 (9th Cir. 1994). But "in determining whether damages are speculative, [courts] distinguish[] uncertain damage, which prevent[s] recovery, from an uncertain extent of damage, which [does] not prevent recovery." *Ruskin v. Thomas/Spelling Prods.*, 232 F.3d 896, 2000 WL 983747 (Table), at *1 (9th Cir. July 17, 2000).

Plaintiff's claim that Moto-Biz suffered damages from Defendant's failure to help apply for a second PPP loan is too uncertain. First, Plaintiff simply speculates that  Moto-Biz would have received the loan. Second, Plaintiff assumes without providing adequate justification that the loan would have been forgiven. Even if Moto-Biz successfully obtained the loan, the loan amount would have been a liability to Moto-Biz if the loan was not forgivable. Thus, Plaintiff does not show damages from Defendant's failure to act.

As for the insurance funds held in trust, Defendant presents facts showing that her actions resulted in a benefit to Moto-Biz rather than damages. Defendant shows that she successfully negotiated a 50% discount on attorneys' fees without any interest or penalties. Thus, in addition to the business judgment rule, Plaintiff's breach of fiduciary duties claims fail because he cannot show damages. The Court, therefore, grants summary judgment for Defendant on Plaintiff's breach of the duty of care and breach of the duty of loyalty claims.

### B.     Oppression and Deadlock under O.R.S. 60.952

O.R.S. 60.952 provides remedies that courts may order in actions brought by shareholders of close corporations. The statute applies, among other situations, when

> [t]he directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock.

O.R.S. 60.952(1)(a). Remedies a court may order include prohibiting, alerting, or setting aside actions of shareholders, directors, or officers; canceling or altering a provision of the corporation's articles of incorporation or bylaws; removing officers or directors; appointing individuals as officers and directors; and an accounting with respect to any matter in dispute.

O.R.S. 60.952(2)(a)-(e). In his Second Amended Complaint, Plaintiff asks the Court to enter judgment granting such remedies.

Defendant argues that she is entitled to summary judgment on this claim because Plaintiff cannot show that she has engaged in oppressive conduct. Defendant asserts that Plaintiff controls the corporation rather than Defendant. Thus, Defendant argues that she cannot be the oppressor. *See Hayes v. Olmsted & Assoc., Inc.*, 173 Or. App. 259, 265 (2001) (emphasis added) ("[B]reach of fiduciary duty *by those who control* a closely held corporation normally constitutes oppression.").

Regardless, the remedies under O.R.S. 60.952 do not require the Court to find wrongdoing by either party. The plain language of the O.R.S. 60.952 authorizes courts to order remedies solely because "directors are deadlocked in the management of corporate affairs." O.R.S. 60.952(1)(a). The statute authorizes the Court to provide any remedy that it sees fit if the parties cannot agree on how to manage the corporation moving forward. For instance, O.R.S. 60.952 allows courts to appoint a custodian to manage the business and affairs of the corporation; appoint a provisional director; order the purchase by the corporation or a shareholder of all the shares of another shareholder; or order dissolution of the corporation if none of the other listed remedies are sufficient. O.R.S. 60.952(2)(f)-(g),(k),(m). Accordingly, the Court denies Defendant's motion for summary judgment as to Plaintiff's claim for remedies under O.R.S. 60.952.

## II.    Defendant's Counterclaims and Third-Party Claims

Both Plaintiff and Defendant move for summary judgment on Defendant's counterclaims. Third-Party Defendants move for summary judgment on all claims against them.

A.        **Breach of Fiduciary Duties**

Defendant brings claims individually and derivatively on behalf of Moto-Biz, Mojo Biz, Noor, and Lucky Strike against both Plaintiff and Third-Party Defendant Johnson.[2] Defendant claims that Plaintiff breached fiduciary duties owed to her and to the various business entities.[3] To establish breach of fiduciary duties under Oregon law, Defendant must show that (1) Plaintiff owed a fiduciary duty to Defendant or to each business entity; (2) Plaintiff breached that duty; and (3) Defendant or the various business entities suffered damages as a result of the breach. *Giuliano v. Anchorage Advisors, LLC*, 19 F. Supp. 3d 1087, 1103 (D. Or. 2014) (citing *Evergreen Est Bus. Ctr., LLC v. Emmert*, 254 Or. App. 361, 367, 296 P.3d 545, 549 (2012)).

Defendant also asserts that Third-Party Defendant aided and abetted Plaintiff in his breach of fiduciary duties. Under Oregon law, "a person who acts in concert with or gives substantial assistance or encouragement to a fiduciary who breaches a duty to a third party may be liable for the resulting harm." *Reynolds v. Schrock*, 341 Or. 388, 346, 142 P.3d 1062, 1065 (2006) (en banc). A party may be subject to liability for aiding and abetting if that party:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

---

[2] On August 25, 2022, the Court granted Third-Party Defendants' motion to dismiss Defendant's aiding and abetting breach of fiduciary duties claim against R&K. *See Motameni*, 2022 WL 3682940, at *6.

[3] Based on the same actions by Plaintiff, Defendant alleges that Plaintiff breached fiduciary duties owed to Moto-Biz, Mojo Biz, Noor, and Lucky Strike in Claim Two and breached his contractual obligation to act in good faith under the bylaws of each company in Claim Three of Defendant's counterclaims. The Court considers these counterclaims together. The Court previously dismissed Defendant's breach of contract claims against Third-Party Defendants. *See Motameni*, 2022 WL 3682940, at *8.

*Id.* at 345 (quoting Restatement (Second) of Torts § 876). Defendant's breach of fiduciary duties claims are addressed as to each entity below.

           i.     *Moto-Biz*

As for Moto-Biz, Defendant's claims stem from the following actions by Plaintiff, which Defendant asserts were aided and abetted by Third-Party Defendant Johnson: (1) depleting funds from insurance proceeds received after the Dosha spa explosion; (2) paying Plaintiff's personal expenses from Moto-Biz business accounts; (3) saddling Moto-Biz with a loan guarantee on R&K's mortgage loan; (4) suspending $7,500 monthly payments from Moto-Biz to Defendant; and (5) paying Third-Party Defendant Johnson expense reimbursements and ongoing salary when Moto-Biz was in financial distress. Counterclaims and Third-Party Compl. ("TPC") ¶¶ 49-60, ECF 32.

Plaintiff and Third-Party Defendant argue that they are entitled to summary judgment because Defendant's claims are time-barred. Claims for breach of fiduciary duties are subject to a two-year statute of limitations. *Padrick v. Lyons*, 277 Or. App. 455, 465 (2016) (citing O.R.S. 12.110(1)). Because statute of limitations is an affirmative defense, Plaintiff and Third-Party Defendant have the burden to show that Defendant's claims are time-barred. *See T.R. v. Boy Scouts of Am.*, 344 Or. 282, 299, 181 P.3d 758, 767 (2008). Under the discovery rule, the limitations period begins to run when a plaintiff "knew or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements of a claim (harm, causation, and tortious conduct) existed." *Matter of Bonome*, 314 Or. App. 364, 369 (2021) (citation and brackets omitted). Thus, to assert a statute of limitations defense, Plaintiff and Third-Party Defendant must show that more than two years before bringing her claims, Defendant (1) knew about their allegedly

wrongful actions; (2) knew or reasonably should have known those actions were wrongful; and (3) knew those actions caused or would cause harm to Defendant or to Moto-Biz. *See id.*

Plaintiff filed this action on July 6, 2021, and Defendant brought counterclaims and third-party claims on March 8, 2022. Under a two-year statute of limitations, the first question is whether Defendant's breach of fiduciary duty counterclaims may only relate to facts Defendant discovered on or after July 6, 2019 or on or after March 8, 2020. Although not uniformly resolved, most courts that have dealt with this issue have held that a plaintiff's initiation of a suit tolls the statute of limitations on the defendant's counterclaims that arise out of the same transaction or occurrence. *See* Fed. R. Civ. P. 13(a); *Orange Cnty. Health Care Agency v. Dodge*, 793 F. Supp. 2d 1121, 1129 (C.D. Cal 2011). In other words, filing an action tolls the statute of limitations on *compulsory* counterclaims. Because both Plaintiff's claims and Defendant's counterclaims arise out of many of the same transactions and occurrences related to the financial management of Moto-Biz, the counterclaims are likely compulsory under Rule 13(a). Thus, for the counterclaims, Plaintiff is only entitled to a statute of limitations defense if Defendant was aware of the tortious conduct, harm, and causation before July 6, 2019. On the other hand, because Defendant's claims against Third-Party Defendant are not compulsory counterclaims, those claims are time-barred as to any actions that Defendant knew were wrongful before March 8, 2020.

Plaintiff and Third-Party Defendant present compelling evidence that Defendant knew several years before 2019 about many of the actions she alleges constitute breach of fiduciary duties. Defendant received information about Plaintiff using Moto-Biz accounts to pay his personal credit card bills as early as 2013. *See* Banks Decl. Ex. 3. Defendant knew about Moto-Biz's loan guarantee for the R&K mortgage loan in 2013 because she signed the documents. *See*

Banks Decl. Ex. 34. And she knew that Moto-Biz paid Third-Party Defendant Johnson a monthly salary since 2003.

But other than the loan guarantee, questions of fact exist as to when Defendant knew or should have known the alleged actions were wrongful. For example, payment of Plaintiff's credit card expenses in lieu of $7,500 monthly draws may not have been wrongful until Defendant's $7,500 draws were suspended in 2019. And Defendant may have only known that Third-Party Defendant's ongoing salary payments were wrongful if she discovered that Third-Party Defendant was no longer doing work for Moto-Biz. Thus, Plaintiff and Third-Party Defendant have only met their burden of showing that Defendant's claims for breach of fiduciary duties to Moto-Biz are time-barred as to the loan guarantee on the R&K mortgage. Otherwise, Defendant's claim for breach of fiduciary duties and aiding and abetting breach of fiduciary duties to Moto-Biz are not time-barred.

Plaintiff and Third-Party Defendants next argue that Defendant cannot produce evidence that either she or Moto-Biz were harmed by the alleged breaches of fiduciary duties. Summary judgment may be granted "if there is an absence of evidence to support the non-moving party's case." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010). Defendant presents a theory that Plaintiff extracted Moto-Biz funds for his own personal use while claiming the business was in financial distress and suspending her monthly draws. But Defendant points to no specific transactions in which Plaintiff depleted Moto-Biz funds or reimbursed himself for anything besides business expenses or previously agreed upon mutual monthly draws. Defendant also presents no evidence Plaintiff misused the insurance proceeds from the Dosha spa explosion; she simply speculates that the funds were misused because she does not know how the funds were spent. Such speculation is insufficient for Defendant's claims to survive summary judgment. *See*

*Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) (to survive summary judgment, "there must be evidence on which the jury could reasonably find for [the non-moving party]"). In addition, Defendant presents no evidence showing that Third-Party Defendant acted in concert with Plaintiff as needed to establish her aiding and abetting breach of fiduciary duties claim. *See Reynolds v. Schrock*, 341 Or. 338, 345 (2006) (holding that third-party may only be liable for another's tort if the third-party acted in concert with or gave substantial assistance to the defendant); *Padrick v. Lyons*, 277 Or. App. 455, 472, 372 P.3d 528, 539 ("[T]he third party's 'substantial assistance' must represent the person's active participation in the furtherance of the tortious objective.").

Accordingly, the Court grants summary judgment for Plaintiff on Defendant's counterclaim for breach of fiduciary duties and for Third-Party Defendant on Defendant's third-party claim for aiding and abetting breach of fiduciary duties to Moto-Biz.

## ii.    *Mojo Biz*

Defendant alleges that Plaintiff, aided and abetted by Third-Party Defendant Johnson, breached fiduciary duties to Mojo Biz and Defendant based on the following:

1. Paying "guaranteed payments" to Plaintiff and Third-Party Defendant despite the Mojo Biz Operating Agreement specifically prohibiting members from receiving a salary.

2. Entering into a "one-sided" lease of the Vancouver Building that benefitted R&K at the expense of Mojo Biz.

3. Transferring $907,790 of the mortgage loan liability from R&K to Mojo Biz in the form a promissory note.

4. Taking a $100,000 contribution from Defendant's capital account and characterizing it as a gift to purchase the Vancouver Building.

5. Causing Mojo Biz to guarantee R&K's mortgage loan for the Vancouver Building.

TPC ¶¶ 69-78.

Plaintiff and Third-Party Defendant argue that Defendant's breach of fiduciary duties claims related to Mojo Biz are time-barred under the two-year statute of limitations. With several of the claimed tortious acts, Plaintiff and Third-Party Defendant present compelling evidence that Defendant knew or should have known the relevant facts and the harm to herself and Mojo Biz caused by these acts more than two years before this action commenced.[4] For example, Defendant knew of the $100,000 "gift" to help purchase the Vancouver Building because it was listed as such on her 2014 tax returns. No later than 2013, Defendant was also aware of Mojo Biz's lease of the Vancouver Building, Mojo Biz's guarantee of the R&K mortgage loan, the construction holdback on R&K's loan for buildout of the Vancouver Building, and that the cost of the buildout was to be paid by Mojo Biz. If such transactions were wrongful and caused harm to Mojo Biz, nothing at the time prevented Defendant from knowing the impropriety of those transactions. In other words, Defendant knew about the transactions that give rise to her claims, and if those transactions were indeed wrongful, she should have known about that wrongfulness at the time they occurred. Thus, Defendant's claims based on these actions fall outside the limitations period.

Plaintiff and Third-Party Defendant have also shown that Defendant knew or should have known about the "guaranteed payments" in lieu of salary as early as 2010. Nonetheless, those payments were ongoing and continued into the limitations period. Defendant brought her counterclaims and third-party claims on March 8, 2022. Thus, Defendant's claims regarding

---

[4] The claims for breach of fiduciary duties to Mojo Biz are not compulsory counterclaims and are not subject to tolling at the time Plaintiff filed this case. Thus, only claims based on actions that Defendant knew were wrongful after March 8, 2020 fall within the limitations period.

guaranteed payments from March 8, 2022 forward fall within the limitations period and are not time-barred.

Plaintiff and Third-Party Defendant next argue that Defendant does not present evidence of harm to herself or to Mojo Biz from the alleged breaches of fiduciary duties. As with Moto-Biz, Defendant provides no facts showing that any of Plaintiff's actions she alleges to constitute breaches of fiduciary duties resulted in a financial loss to Mojo Biz. The record evidence shows that Mojo Biz received a benefit from the build-out of the Vancouver Building, contributed less than the value of that build-out, and benefits from the leasing the Vancouver Building to use as a campus for the Aveda Institute.

Nor does Defendant show that the guaranteed payments from Mojo Biz to Plaintiff and Third-Party Defendant for their services to the company diminished her share of the value of the company. Defendant had initially agreed to these payments as compensation for Plaintiff and Third-Party Defendant running the company. Yet Defendant asks the Court to infer that the guaranteed payments harmed her and Mojo Biz. The Court must draw any inferences from the facts in the light most favorable to Defendant as the non-moving party. *Earl*, *658* F.3d at 1112. Still, Defendant must provide some evidence that supports her claim for damages in the first instance. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."). Because Defendant does not do so, her claim for breach of fiduciary duties to Mojo Biz fails.

        *iii.*   *Noor*

Defendant's sole claim related to Noor is that Plaintiff allows R&K to use the Noor Building without paying rent. Defendant asserts that Plaintiff has breached his fiduciary duty to

Noor by allowing uncompensated use of the Noor Building by an entity he co-owns with Third-Party Defendant Johnson.[5]

Plaintiff does not dispute that he owes a fiduciary duty to Noor. And undisputed evidence shows that the Noor Building is the listed as the business address of R&K. But Plaintiff argues that R&K only uses the Noor Building as a place to receive its mail. Defendant argues, without presenting clear evidence, that R&K's officers use the Noor Building for meetings and other work. However, even if Plaintiff and Third-Party Defendant use the Noor Building for various purposes, Defendant does not show they use the building in their capacities as officers of R&K. Plaintiff is an officer of Moto-Biz and manager of Mojo Biz, and Third-Party Defendant is an employee of both entities. Both Moto-Biz and Mojo Biz use the Noor Building to conduct business. Because the various business entities that conduct business for Dosha Spas and the Aveda Institute are intertwined, Defendant must present some evidence that Plaintiff or other individuals use the Noor Building on behalf of and for the benefit of R&K. Defendant does not do so. Nor does Defendant show that Noor has suffered harm from any use of the Noor Building by R&K. As a result, Plaintiff is entitled is entitled to summary judgment on Defendant's counterclaim for breach of fiduciary duties to Noor.

> iv.    *Lucky Strike*

Defendant asserts a counterclaim for breach of fiduciary duties against Plaintiff on behalf of Lucky Strike. Defendant generally alleges that Plaintiff misappropriated insurance funds received by Moto-Biz that were earmarked to pay for a new building that was to be owned by Lucky Strike. But Defendant presents no facts about any specific transactions that constitute

---

[5] The Court previously dismissed Defendant's third-party claim for aiding and abetting breach of fiduciary duties to Noor. *Motameni*, 2022 WL 3682940, at *7.

misappropriation or co-mingling of funds. Nor does Defendant point to any specific actions by Plaintiff that damaged Lucky Strike. Even if Defendant had presented facts showing Plaintiff misused the insurance settlement funds, those funds belonged to Moto-Biz rather than Lucky Strike. Defendant's unsupported allegations as to Lucky Strike are insufficient to survive summary judgment. Accordingly, Defendant's claim for breach of fiduciary duties on behalf of Lucky Strike fails.

Because Defendant presents no facts to support her allegations that Plaintiff breached fiduciary duties to the four business entities, that Third-Party Defendant acted in concert with Plaintiff, or that any of the four business entities suffered financial harm as a result of Plaintiff's actions, the Court grants summary judgment for Plaintiff and Third-Party Defendant and denies summary judgment for Defendant on Defendant's breach of fiduciary duties claims. For the same reasons, the Court grants summary judgment for Plaintiff and denies summary judgment for Defendant on Defendant's breach of contract claim.

### B.    Conversion

Under Oregon law, conversion is an "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Talk Radio Network Enters. v. Cumulus Media Inc.*, 271 F. Supp. 3d 1195, 1210 (D. Or. 2017) (quoting *Mustola v. Toddy*, 253 Or. 658, 663, 456 P.2d 1004, 1007 (1969)). Money can be chattel, but "there can be no conversion of money unless it was wrongfully received by the party charged with conversion or unless such party was under obligation to return the specific money to the party claiming it." *Id.* (quoting *Wood Indus. Corp. v. Rose*, 271 Or. 103, 108, 530 P.2d 1945, 1248 (1975). A claim for conversion may lie where the plaintiff asserts that the chattel is some "ear-marked money, or

specific money capable of identification, or coins or notes that have been entrusted to the defendant's care." *Wood Indus. Corp.*, 271 Or. at 108.

Defendant claims that her $100,000 gift to Mojo Biz and the monthly payments of $7,500 she was owed from Moto-Biz were diverted to cover the "guaranteed payments" from Mojo Biz to Plaintiff and Third-Party Defendant. Defendant also asserts that saddling her co-owned businesses with loan guarantees on R&K's mortgage loan for the Vancouver Building constitutes conversion. On August 25, 2022, the Court dismissed Defendant's third-party claim for conversion based on suspension of the Moto-Biz draws and the loan guarantees. *See Motameni*, 2022 WL 3682940, at *9. Now, at the summary judgment stage, the rest of Defendant's conversion claim fails.

First, Defendant presents no evidence that the $100,000 contribution she made toward the down payment on the Vancouver Building was wrongfully received by either Plaintiff or Third-Party Defendant. The evidence shows that Defendant voluntarily made that contribution and knew that it was classified as a "gift" for tax purposes. Defendant presents no evidence that she expected to retain control over those funds or that the funds were to be returned to her. Second, Defendant presents no facts showing that any of Plaintiff's and Third-Party Defendant's guaranteed payments were drawn from her $100,000 contribution. To prove her theory of conversion, Defendant must show that the Mojo Biz funds used for the guaranteed payments came from money that was ear-marked for her. Defendant provides no facts to support her theory. Thus, Defendant's conversion claim fails, and the Court grants summary judgment for Plaintiff and Third-Party Defendant on this claim.

### C.       Unjust Enrichment

Defendant asserts unjust enrichment on behalf of herself and her co-owned companies (Moto-Biz, Mojo Biz, and Noor) against Plaintiff and Third-Party Defendants Johnson and R&K. Defendant alleges the following actions by those parties constitute unjust enrichment:

1. Plaintiff diverted cash distributions owed to Defendant to pay for the down payment on the Vancouver building owned by R&K;

2. Plaintiff imposed loan liability owed by R&K onto Mojo Biz;

3. Plaintiff suspended $7,500 monthly payments that Defendant had been receiving and diverted those funds to himself and Third-Party Defendants;

4. Plaintiff diverted $2,066,249 in funds from Mojo Biz for unauthorized "guaranteed payments" to himself and Third-Party Defendant;

5. Plaintiff imposed unconditional guarantees on Defendant and her co-owned businesses to secure a mortgage loan of $3,075,000 owed by R&K on the Vancouver Building.

TPC ¶¶ 122-129.

Under Oregon law, a claim for unjust enrichment requires the plaintiff to establish that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware that it had received a benefit; and (3) under the circumstances, it would be unjust for the defendant to retain the benefit without paying for it." *Winters v. Cnty. of Clatsop*, 210 Or. App. 417, 421, 150 P.3d 1104, 1106 (2007). But the Oregon Supreme Court recently "rejected the formulaic, three-step approach previously laid out for unjust enrichment claims . . . in favor of a case-by-case analysis." *LRY, LLC v. Lake Cnty.*, No. 1:17-cv-00675-MC, 2018 WL 5300387, at *5 (D. Or. Oct. 25, 2018) (citing *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 127-131, 404 P.3d 912, 918-921 (2017)). Courts must now "examine the established categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." *Larisa's Home Care*, 362 Or. at 132.

Although not specifically stated in the elements, the tort of unjust enrichment anticipates some wrongful action on the part of the defendant or a third-party that causes the conferral and retention of the benefit to be unjust. The Restatement (Third) of Restitution and Unjust Enrichment § 44 provides:

> (1) A person who obtains a benefit *by conscious interference with a claimant's legally protected interests* (or the consequences of such interference by another) is liable in restitution as necessary to prevent unjust enrichment . . .
> (2) For purposes of subsection (1), interference with legally protected interests includes *conduct that is tortious*, or that *violates another legal duty of prohibition* (other than duty imposed by contract), *if the conduct constitutes an actionable wrong to the claimant*. (emphasis added).

Plaintiff and Third-Party Defendant assert that Defendant's claim for unjust enrichment is time-barred. Third-Party Defendant also argues that Defendant's unjust enrichment claim fails because she does not present facts showing that any of the transactions of which she complains were wrongful or unjust. The Court addresses each allegedly unjust transaction in turn.

### i.    *$100,000 "Gift" for Down Payment on the Vancouver Building*

Defendant contends that Plaintiff and Third-Party Defendant were unjustly enriched when she contributed $100,000 toward purchase of the Vancouver Building even though the building is owed by R&K—a company in which she has no ownership interest. This claim fails for two reasons. First, Defendant's claim is time-barred because Defendant made the $100,000 payment in 2013 knowing that she would have not have an ownership interest in the Vancouver Building. *See* Adams Dep. 192:15-25; Banks Decl. Ex. 30. Because Defendant brought her claim in March 2022, the claim is time-barred under the two-year statute of limitations for unjust enrichment claims. *See Htaike v. Sein*, 269 Or. App. 284, 294, 344 P.3d 527, 533-34 (2015) (holding that two-year statute of limitations for tort claims under O.R.S. 12.110(1) applies to unjust enrichment claims).

Second, Defendant presents no facts showing tortious conduct on the part of Plaintiff or

Third-Party Defendants. Defendant allowed the gift payment to be made with full knowledge

that R&K, a company in which she has no ownership interest, would own the building. And

Defendant knew that her $100,000 payment was characterized as a gift on her 2014 tax returns.

Defendant does not allege in the operative pleading that she was fraudulently induced into

making the payment and presents no facts showing that Plaintiff or Third-Party Defendant

misrepresented the purpose of that payment.

ii.    *Imposed Liability from R&K to Mojo Biz*

Defendant contends that a promissory note executed between Mojo Biz and R&K

unjustly enriched R&K by shifting $907,000 of its mortgage loan liability onto Mojo Biz. First,

Defendant's unjust enrichment claim based on this transaction is time-barred. Plaintiff and

Third-Party Defendant present clear evidence that Defendant knew about the promissory note in

2014 but did not assert the unjust enrichment claim until March 2022. Thus, Defendant brings

her claim beyond the two-year statute of limitations.

Second, the record evidence shows that neither Plaintiff nor Third-Party Defendants

received an unjust financial benefit from the shift in mortgage loan liability. R&K purchased the

Vancouver building to house a new campus for the Aveda Institute, which is owned by Mojo

Biz. The parties present facts showing that at the time R&K obtained a mortgage loan to

purchase the Vancouver Building, $1.2 million was earmarked as a construction holdback to

buildout the Aveda Institute campus. Evidence shows that the parties intended Mojo Biz to cover

the cost of the buildout. Thus, the $907,000 in mortgage loan liability shifted to Mojo Biz was

lower than the parties had originally anticipated. In addition, R&K later reduced the amount of

Mojo Biz's liability on the promissory note by $500,000. Based on these presented facts,

Defendant's claim that Plaintiff and Third-Party Defendants were unjustly enriched at Mojo Biz's expense fails.

### iii. *Suspending Defendant's $7,500 Monthly Draws from Moto-Biz*

Defendant claims that Plaintiff unilaterally suspended $7,500 monthly payments owed to her from Moto-Biz and shifted those funds to himself and Third-Party Defendants. Whether the $7,500 payments were owed to Defendant and whether Plaintiff could rightfully suspend those payments by withdrawing consent are unresolved issues involving disputed facts. Nevertheless, Defendant's claim fails because she presents no facts showing that either Plaintiff or Third-Party Defendants were unjustly enriched when these monthly draws were discontinued.

When Defendant's monthly draws stopped, Moto-Biz retained the additional $7,500 per month. As for Third-Party Defendants, neither Johnson nor R&K have any ownership or other financial interest in Moto-Biz. Thus, they were not unjustly enriched by the funds Defendant stopped receiving from Moto-Biz. As for Plaintiff, Defendant presents no facts showing that Plaintiff personally received any of the funds retained by Moto-Biz. Plaintiff asserts that he also stopped taking compensation from Moto-Biz when Defendant's monthly draws were suspended in 2019. Defendant does not dispute this assertion. Thus, Defendant fails to show that either Plaintiff or Third-Party Defendants were unjustly enriched when her monthly draws were discontinued and those funds were retained by Moto-Biz.

### iv. *"Guaranteed Payments" from Mojo Biz*

Defendant asserts that Plaintiff and Third-Party Defendant Johnson unjustly enriched themselves by taking monthly guaranteed payments from Mojo Biz. Defendant is a member of Mojo Biz and owns a 24% share of the LLC. Therefore, any funds that Plaintiff or Third-Party Defendant wrongfully received from Mojo Biz would interfere with her legally protected

financial interest in the company. However, Defendant presents no facts showing that the guaranteed payments constitute an actionable wrong on the part of Plaintiff or Third-Party Defendant.

Plaintiff and Third-Party Defendant present evidence showing that all four members of Mojo Biz orally agreed to the guaranteed payments in 2009 or 2010 as compensation for the work Plaintiff and Third-Party Defendant were doing to run the Aveda Institute. Defendant does not show that she objected to the payments until 2020. In 2020, a majority (three of four) of Mojo Biz members approved a written resolution codifying the oral agreement. The resolution approved and ratified all past guaranteed payments to Plaintiff and Third-Party Defendant and authorized ongoing payments. Because the guaranteed payments were authorized by Mojo Biz, Defendant cannot show that the compensation received by Plaintiff and Third-Party Defendant was wrongful or unjust. Thus, even viewing the facts in Defendant's favor, Plaintiff and Third-Party Defendant are entitled to summary judgment on this claim.

*v.    Unconditional Loan Guarantees*

Defendant contends that the guarantees by her, Moto-Biz, Mojo Biz, and Noor on R&K's mortgage loan for the Vancouver Building constitute unjust enrichment for Plaintiff and Third-Party Defendants. This claim is time-barred under the two-year statute of limitations for unjust enrichment claims. Evidence shows that Defendant knew about these loan guarantees in 2013 because she signed and executed the documents. In addition, Defendant does not show that R&K has defaulted or missed any payments on the mortgage loan. Thus, there is no evidence that Plaintiff or either Third-Party Defendant has received a financial benefit from the loan guarantees. Accordingly, Defendant does not make a prima facie showing that the loan guarantees constitute unjust enrichment.

Because Defendant's unjust enrichment claims is both time-barred or fails on the merits, the Court grants summary judgment for Plaintiff and Third-Party Defendant on this claim.

**CONCLUSION**

The Court GRANTS Plaintiff's Motion for Partial Summary Judgment on Defendant's counterclaims [89] and GRANTS Third-Party Defendants' Motion for Summary Judgment on Defendant's third-party claims [84]. The Court GRANTS in part and DENIES in part Defendant's Motion for Partial Summary Judgment [86]. Specifically, the Court grants summary judgment for Defendant on Plaintiff's claims for breach of the duty of care and breach of the duty of loyalty. The Court denies summary judgment for Defendant on Plaintiff's claim for relief for deadlock in a close corporation under O.R.S. 60.952. The Court also denies summary judgment for Defendant on her counterclaims.

IT IS SO ORDERED.


DATED:_____July 24, 2023_____.



_____
MARCO A. HERNÁNDEZ
United States District Judge